**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| LARRY D. FRYE, | ) | C/A No. 9:20-CV-3011-MHC |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter came before the Court for a non-jury trial on Plaintiff Larry D. Frye's ("Plaintiff" or "Mr. Frye") claims against Defendant United States of America ("Defendant" or "the government") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq.* ("FTCA").

In 2018, Plaintiff was incarcerated in the Bureau of Prisons ("BOP") at the Federal Correctional Institution ("FCI") Edgefield, South Carolina. He was injured in a fight with a fellow inmate on August 7, 2018, and is suing the government for medical malpractice regarding the treatment he received for his injury from health care providers at FCI Edgefield and its affiliated BOP health services clinic.

## EVIDENCE PRESENTED

Trial was held in Greenville, South Carolina, from October 18–21, 2022. C. Caleb Connor and Anne K. Moore represented Plaintiff, and Robert Sneed and Sheria Clarke represented Defendant.

Plaintiff offered testimony from nine witnesses, including seven FCI Edgefield medical department staff, Plaintiff, and a medical expert: Dr. Rex Blocker, M.D. ("Dr. Blocker"), the BOP treating physician; Meghan Hawkes, R.N. ("RN Hawkes"), a BOP nurse; Steven Sizemore,

1

FNP ("FNP Sizemore"), a BOP mid-level medical provider; Denis Salmon ("HSA Salmon"), a BOP health services assistant responsible for scheduling medical trips for prisoners; Dr. Terrance Baker, MD ("Dr. Baker"), Plaintiff's retained medical expert in the fields of family medicine and the nursing standard of care; Patina Walton-Battle ("NP Battle"), a BOP mid-level medical provider; Plaintiff Larry Frye; Kirsten Sizemore, (née Eldred), P.A. ("PA Eldred-Sizemore"), a BOP mid-level medical provider; and Charles Thomas, R.N. ("RN Thomas"), a BOP nurse.

Defendant offered testimony of Dr. Terry Steyer, M.D. ("Dr. Steyer"), Defendant's retained medical expert in the field of family medicine; Dr. Eddie Anderson, D.O. ("Dr. Anderson), a BOP treating physician after Plaintiff was transferred to another facility; and Dr. Wilnetta Sweeting, D.D.S. ("Dr. Sweeting"), a BOP dentist who treated Plaintiff at FCI Edgefield.

Both parties' experts were qualified and testified in their respective fields. In addition to testimony of fact and expert witnesses, numerous exhibits were entered as evidence. The parties made closing arguments at trial and subsequently submitted proposed findings of fact and conclusions of law.

## LEGAL STANDARD FOR A NONJURY CIVIL TRIAL

"In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1).

"Rule 52(c) expressly authorizes district judges to resolve disputed issues of fact." *M & M Poultry, Inc. v. Pilgrim's Pride Corp.*, 281 F. Supp. 3d 610 (N.D.W. Va. 2017). Rule 52 "requires that a party be 'fully heard' before a judgment is rendered on a particular issue." *First*

*Virginia Banks, Inc. v. BP Expl. & Oil Inc.*, 206 F.3d 404, 407 (4th Cir. 2000) (quoting Fed. R. Civ. P. 52(c)). "Under this Rule, a court assesses the evidence presented and may render judgment if the evidence is insufficient to support a claim or defense." *Ethox Chem., LLC v. Coca-Cola Co.*, No. 6:12-cv-01682-KFM, 2015 WL 12807733, at *2 n.4 (D.S.C. Sept. 30, 2015), *aff'd Ethox Chemicals LLC v. Coca-Cola Co.*, 683 F. App'x 958 (Fed. Cir. 2017).

Where the Court serves as the trier of fact, it must determine the credibility of witnesses and the weight to be given their testimony. *See J.S.K. Co. v. New Plan Realty Tr.*, 9 F. App'x 89 (4th Cir. 2001). The Court has both the right and the duty to weigh the evidence and to draw reasonable inferences and deductions. *See United States. v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987) (explaining that where a jury trial is waived, the judge weighs the evidence, determines the credibility of witnesses, and finds the facts).

 Having carefully reviewed the testimony and evidence at trial, the parties' arguments, and the applicable law, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## **FINDINGS OF FACT**

1.    This action arises under the FTCA, 28 U.S.C. § 2671.

2.    Pursuant to 28 U.S.C. § 2675, Plaintiff filed his claim for damages and injuries with Defendant. The claims were received and accepted for filing by the BOP, Southeast Regional Office, on January 28, 2019. Tr. 531.[2]

3.    On May 6, 2020, the BOP denied Plaintiff's claim. Plaintiff was further advised that he

---

[1] In making these Findings of Fact, the Court has determined the credibility of witnesses, weighed the evidence, and drawn reasonable inferences and deductions from the evidence. *See J.S.K. Co.*, *supra*; *Bales*, *supra*. To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be adopted as such.

[2] "Tr." refers to the trial transcript, followed by the page number of the transcript.

had six months from the date of the BOP's denial letter to bring suit in the appropriate United States District Court as all administrative requirements of the Act had been satisfied.

4.    Prior to the initiation of this lawsuit, Plaintiff exhausted his administrative remedies as required under 28 CFR § 542.14, *et. seq.*

<u>The Parties and Health Care Team at FCI Edgefield</u>

5.    In the fall of 2018, Mr. Frye was 60 years old. He was incarcerated at FCI Edgefield until he was transferred in November 2018. Tr. 530, 600, 603. During the relevant time, Mr. Frye was housed in the special housing unit ("SHU") at FCI Edgefield. Tr. 600, 603.

6.    Defendant United States of America is a political entity acting through its agents and/or employees at FCI Edgefield. FCI Edgefield is operated by the BOP, a division of the United States Department of Justice.

7.    FCI Edgefield, a medium-security federal prison, and its affiliated BOP health services clinic, is located at 501 Gary Hill Road in Edgefield, South Carolina.

8.    During August through November of 2018, Dr. Rex Blocker, RN Meghan Hawkes, RN Richard Velez, FNP Stephen Sizemore, NP Patina Walton-Battle, PA Kirsten Eldred-Sizemore, HSA Denis Salmon, Dalton Wates, and RN Charles Thomas were employed by the BOP. ECF No. 80, ¶¶ 5–6.

9.    In 2018, NP Patina Walton-Battle served as the health services administrator at FCI Edgefield, and her role was primarily administrative, rather than clinical. Tr. 718. She was responsible for ensuring that the health services clinic was administered according to the policies and procedures of the BOP. Tr. 718. In this role, NP Walton-Battle was also responsible for providing a response to and conducting investigations of any complaints about care and treatment lodged by inmate patients. Tr. 740.

10.     In 2018, Dr. Rex Blocker was the clinical director of the medical facility at FCI Edgefield and was responsible for the overall clinical oversight and operations of the medical facility at the prison. Tr. 7–8. Dr. Blocker was responsible for the provision of healthcare within the facility, and he functioned as the primary physician for a full scope and range of medical services to inmates. Tr. 8, 10, 15.

11.     Dr. Blocker's duties and responsibilities generally included performing general practice type medicine in accordance with established medical practice and procedures and in accordance with policies of Health Services and the BOP; ensuring the staff he supervised were compliant with policies and procedures; making decisions in consultation with members of the medical and institutional staff; providing clinical care at the institution; evaluating patient care through an ongoing quality assurance program that identifies problems and resolutions; supervising and managing staff in the healthcare unit; assigning, directing, and reviewing work of physician extenders and nurses; and planning and scheduling to ensure sufficient staff to ensure the needs of the inmates were being met. Tr. 10–14; PX 33.[3]

12.     Specifically, Dr. Blocker was responsible for examining and treating patients at FCI Edgefield; providing hands-on care including minor surgical treatments; rendering emergency medical and surgical services as required; and ordering x-rays and other tests and coordinating and approving consults necessary for diagnosis when warranted. Tr. 15–16, 29. In his role as clinical director, Dr. Blocker was the ultimate decision-maker as it relates to the provision and direction of care at the clinic at FCI Edgefield. Tr. 31–32; PX 19.

13.     Mid-level practitioners, including nurse practitioners and physician assistants, were

---

[3] PX and DX refer to the exhibits entered at trial by Plaintiff and Defendant, respectively. When a number follows an exhibit designation, it references the Bates number stamped on the bottom of the page of the exhibit.

responsible for providing primary healthcare for inmates at FCI Edgefield, including comprehensive assessment and management of uncomplicated, acute, and stable chronic health problems; diagnostic impressions; requesting appropriate diagnostic tests and interpreting results of selected findings; and serving as the primary provider for routine requests for evaluation by inmates. Tr. 188–90; PX 34. Mid-level practitioners made patient management decisions in collaboration with physicians and within clinical guidelines. Tr. 188–89; PX 34.

14.    Nurses at FCI Edgefield were responsible for providing a full range of nursing services, including assessing, diagnosing, planning, implementing, and evaluating the medical condition of inmate patients, in accordance with applicable standards. Tr. 156–57; PX 35.

15.    Nurses at FCI Edgefield were also responsible for assessing a patient's condition on an ongoing basis and providing appropriate interventions. Tr. 158; PX 35.

16.    Nurse duties also included infection control. Tr. 158–59; PX 35. It was their responsibility to report signs of infection to either a mid-level provider or a practitioner. Tr. 160.

<u>BOP Healthcare Policies and Procedures</u>

17.    The members of the healthcare team at FCI Edgefield were required to comply with the policies and procedures of Health Services and the BOP, including Patient Care Program Statement; the Procedure Manual for Patient Care; and the program statement for the Health Services Administration. Tr. 21, 22, 29–30; PX 26; PX 13; PX 19.

18.    The Patient Care Program Statement requires healthcare to be delivered to inmates in accordance with proven standards of care. Tr. 21; PX 26. The purpose and scope of the Health Services Unit at FCI Edgefield is to provide medically necessary healthcare to inmates in accordance with proven standards of care without compromise, and the unit is equipped to provide primary healthcare, outpatient clinic, and emergency care to the inmate population. Tr.

6

22–23; PX 13.

19.     Under the Patient Care Procedure Manual, inmates have a right to access healthcare services, including making a sick call note to report a medical issue to Health Services staff. Tr. 26, 39; PX 13. Each inmate also has a right to request to be seen by a physician. Tr. 26; PX 13. An inmate can make that request through various providers or through a written request, referred to as a "cop-out" form. Tr. 27; PX 13. Inmates also have the right to report pain to a healthcare provider and have their pain assessed and managed in a timely and medically acceptable manner. Tr. 41.

20.     The Patient Care Program Statement identifies five major levels of care that define care provided to inmates: medically necessary – acute or emergent; medically necessary – non-emergent; medically acceptable – not always necessary; limited medical value; and extraordinary. PX 26 at 5562–64.

21.     "Medically necessary – acute or emergent" is defined as "[m]edical conditions that are of an immediate, acute or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life-threatening." Examples given include myocardial infarction, severe trauma such as head injury, hemorrhage, stroke, complications associated with pregnancy, detached retina, or sudden loss of vision. Treatment for conditions in this category is essential to sustain life or function and warrant immediate attention. PX 26 at 5562–63.

22.     "Medically necessary – non-emergent" is defined as "[m]edical conditions that are not immediately life-threatening but which without care the inmate could not be maintained without significant risk of: serious deterioration leading to premature death; significant reduction in the possibility of repair later without present treatment; significant pain or discomfort which impairs

the inmate's participation in activities of daily living." PX 26 at 5563. Examples given include chronic conditions like diabetes or heart disease, infectious disorders in which treatment allows for a return to previous state of health or improved quality of life, and cancer.

23.     The Core Values in the program statement for the Health Services Administration includes that all inmates have value as human beings and deserve medically necessary healthcare, that inmates must understand their right to access healthcare, that Health Services at FCI Edgefield is not exempt from applicable standards of care in treating inmates, and that clinicians treating inmates must consider the psychosocial needs of inmates with medical conditions. Tr. 32–34; PX 19.

24.     If an inmate has a concern regarding his healthcare, he has the right to address the concern with any member of the institution staff, including the physician, the healthcare services administrator, members of the unit team, the associate warden, or the warden. Tr. 40, 729, 740. Inmates also have the right to be provided with information regarding their diagnosis, treatment, and prognosis, including the right to be informed of healthcare outcomes that differ significantly from the anticipated outcome and to obtain copies of their healthcare record. Tr. 40, 728.

25.     Nursing staff conduct rounds on the SHU one to two times per day. Tr. 619, 841. Inmates can stop nurses conducting rounds to raise complaints or concerns. They can also place a sick-call note in their cell door with complaints or requests for medical care. Tr. 174. Sick-call notes are retrieved and taken back to the medical department and reviewed. Tr. 174. The request is triaged and, if urgent or emergent, then medical staff address it at that time; if it is a need that is not urgent or emergent or that can be scheduled, an appointment with a medical provider is scheduled for the inmate. Tr. 174.

26.    The difference between urgent versus emergent care with regard to BOP policies is that "emergent means right now, I'm sending someone to the hospital today for chest pains, and they need to be seen, so that is going to be done acute emergent." Tr. 789, ll. 10–23. Urgent, on the other hand, means that it can be addressed at the first immediate appointment they can get with that provider. Tr. 790.

27.    Clinicians are to be compassionate and responsive in the provision of care when a patient has a medical issue that needs to be timely addressed.  Tr. 34; PX 19.

<u>The August 7, 2018 Incident</u>

28.    On Tuesday, August 7, 2018, Mr. Frye was playing checkers when his cell mate approached him with a walking cane and attacked him. Tr. 531–32. During the altercation, the cane broke, and a sharp piece of the cane hit Mr. Frye in the face. Tr. 45, 49, 532, 692. Mr. Frye had a gash on his jaw with blood coming down, an abrasion on his head, and an abrasion on his eye. Tr. 533. He was taken to FCI Edgefield's health services clinic for treatment that day. Tr. 43, 533.

29.    Dr. Blocker evaluated Mr. Frye at FCI Edgefield's health services clinic on August 7, 2018. Dr. Blocker used information supplied by the patient to assess the care that he provided to the patient. Tr. 137–38. According to the treatment notes for August 7, 2018, Mr. Frye reported to Dr. Blocker that his "cellie hit him with a cane," he was bleeding from his chin, and he was experiencing sharp pain (4/10). Tr. 48, 49, 137; PX 2 at 2347–49.

30.    Dr. Blocker also visually examined Mr. Frye, including his head and back. Dr. Blocker felt around to determine if there were any broken bones, which he did not encounter. Tr. 134–35. Dr. Blocker identified a 1-centimeter (cm) laceration to the right side of Mr. Frye's chin and found excoriations to his head, left shoulder, left flank, and neck behind his ear. Tr. 50–51; PX 2

at 2248. Photos were taken of Mr. Frye's injuries Tr. 534; PX 48 at 2890–99.

31.     Dr. Blocker palpated the wound in Mr. Frye's chin to shave the area around the wound before applying a suture, as Mr. Frye had a beard. Tr. 135. Dr. Blocker did not feel any object in the wound at the time. Tr. 135.

32.     Dr. Blocker cleaned Mr. Frye's injuries with antiseptic solution, treated them with an antibiotic ointment, and used one suture to stitch up the laceration of Mr. Frye's chin. Tr. 50, 51; PX 2 at 2348.  Dr. Blocker left the wound in the chin open to allow for drainage. Tr. 135.

33.     After the treatment was completed, Dr. Blocker discharged Mr. Frye and instructed him to follow-up at sick call as needed or to return immediately if his condition worsened. Tr. 52; PX 2 at 2348.

34.     The medical records for the treatment on August 7, 2018, do not reference Mr. Frye being stabbed in the face, nor is there otherwise any notation that Mr. Frye indicated at that time that he was stabbed in the face. PX 2 at 2347–49.

<u>Sunday, August 12 - Monday, August 13, 2018</u>

35.     After the incident, Mr. Frye continued to feel irritation in his jaw. Tr. 539. He could feel something hard in his face around his stitch. Tr. 539. He then pulled out of his chin a piece of wood, which had a black marking similar to the cane with which his cell mate hit him. Tr. 539–40, 544–45. Mr. Frye testified that he removed the wood fragment around 7:30 on a Sunday, several days after his treatment by Dr. Blocker. Tr. 546.

36.     Mr. Frye informed the officer outside his cell that he pulled wood out of his jaw, and the officer said he would notify medical. Tr. 546.

37.     Mr. Frye spoke with FCI Edgefield's RN Hawkes on Sunday, August 12, 2018, while she was performing her SHU sick-call rounds. Tr. 164, 546; PX 2 at 2345. He told her that he was

10

having pain on the right side of his face, where he was hit with a cane, and that he pulled out a piece of wood, measuring approximately two centimeters in length, from his wound. Tr. 53–54, 164; PX 2 at 2345.

38.    RN Hawkes noted that Mr. Frye's stitch was not in place. Tr. 53–54; PX 2 at 2345. She told Mr. Frye she would place an order for an x-ray. Tr. 176, 615.

39.    On August 13, 2018, Dr. Blocker reviewed RN Hawkes's administrative notes. Tr. 52, 53; PX 2 at 2345–46. Because of Mr. Frye's complaints of face pain, Dr. Blocker issued an order for a radiology examination of Mr. Frye's mandible. Tr. 45, 55; PX 2 at 2519–20.

40.    Mr. Frye reported to FCI Edgefield's health services clinic for mandible x-ray imaging on August 13, 2018. Tr. 55, 548; PX 2 at 2519. Mr. Frye told the x-ray technician that he had a piece of wood in his jaw. Tr. 548. The treatment note history indicated that, upon palpitation, the provider could "feel something on the right side of his jaw" but also indicated that there was "no radiographic evidence for retained radiodense foreign body . . .[and] no acute fracture." Tr. 55, 549; PX 2 at 2519.

41.    Dr. Blocker reviewed the x-ray report that same day, August 13. Tr. 56; PX 2 at 2520. He knew that wood would not show up on an x-ray. Tr. 57–58.  He also knew that a negative x-ray should not end the inquiry as to what was going on with Mr. Frye's face. Tr. 57–58.

<u>Tuesday, August 14, 2018 – Thursday, August 30, 2018</u>

42.    Subsequently, Mr. Frye asked RN Hawkes on a medication round when he would be physically examined, to which she responded that there was nothing on his x-ray and no need for him to see medical. Tr. 549.

43.    On August 18, 2018, RN Richard Velez emailed NP Stephen Sizemore, requesting that NP Sizemore reevaluate Mr. Frye because he was complaining about his jaw and "saying there's

11

something wrong." Tr. 59, 191–92; PX 57 at 4874. On August 20, 2018, NP Sizemore responded that he would place Mr. Frye on the list for a medical provider visit. Tr. 191–92; PX 57 at 4874.

44.    On August 20, 2018, Mr. Frye sent a cop-out, indicating he had made numerous requests for a physical examination of the injury on his face. Tr. 551; PX 8 at 475–77. He wrote that he was being refused medical attention and that a piece of wood from the cane used to assault him was stitched up in his face. Tr. 551; PX 8 at 475–77.

45.    At this time, Mr. Frye could feel a piece of wood that extended from the wound opening to his ear and could be manipulated.  He estimated it was three inches long. Tr. 551–52. He was repeatedly told by employees at FCI Edgefield that he was feeling scar tissue, but he indicated to the employees, including Nurses Thompson, Wates, Hawkes, and Velez, that he could push the piece of wood around and repeatedly asked when he would be examined. Tr. 552–53, 562. None of the employees touched his face. Tr. 562.

46.    On August 25, 2018, Mr. Frye complained of pain and a noticeable bump to the right side of his face to RN Wates, who was conducting SHU sick call rounds. Tr. 62–63, 645, 742; PX 2 at 2342. RN Wates documented the encounter and noted that the previous note and chart review showed Mr. Frye stated he pulled a piece of wood from his wound. Tr. 743; PX 2 at 2342. After review of Mr. Frye's chart, RN Wates discussed Mr. Frye's complaints with NP Walton-Battle. Tr. 63, 743; PX 2 at 2342.

47.    On August 25, 2018, NP Walton-Battle directed another x-ray be ordered and for RN Wates to schedule a follow-up with Mr. Frye's provider. Tr. 743; PX 2 at 2342. That same day, NP Walton-Battle emailed PA Kirsten Eldred-Sizemore and others directing her to follow up with Mr. Frye because something was going on with his chin and mandible. Tr. 61–62, 64, 744–46; PX 57 at 3290. NP Walton-Battle acknowledged that time is of the essence when a patient

experiences a change in condition when a foreign object is potentially lodged in their facial structure. Tr. 756.

48.     PA Eldred-Sizemore was not working on August 25 or 26, though that did not negate the need for a patient to be assessed. Tr. 859. PA Eldred-Sizemore was back to work on August 27, 28, and 29, but did not follow-up with Mr. Frye. Tr. 859–60.

49.     On Thursday, August 30, 2018, Mr. Frye approached the warden when she came through the SHU and told her that he had wood in his jaw, that medical was refusing to see him, and that he had requested examination through multiple cop-outs. Tr. 554. The warden asked a Mr. Wilson to look into the matter. Tr. 555.

50.     Shortly thereafter on the same day, Mr. Frye was taken to Dr. Sweeting for a Panorex to determine if wood remained in the lower jaw on the right side of his face after an altercation. Tr. 555, 928; DX 24 at 2434.

51.     Dr. Sweeting was the Chief Dental Officer at FCI Edgefield, and she provided dental care to Mr. Frye. Tr. 896–97.

52.     Mr. Frye told Dr. Sweeting that the wood fragment was visible under his skin. Dr. Sweeting indicated that she saw something but did not touch Mr. Frye's jaw. Tr. 555. She took Panorex x-rays of Mr. Frye's jaw.  Tr. 915–16; DX 24 at 2434.

53.     On these x-rays, no radio-opaque foreign bodies were identified, and no other significant findings were noted, which meant there were no signs of infection or signs of a broken jaw or tooth at this time. Tr. 57–58, 67–70, 917, 929; PX 2 at 2434, 2513. FCI Edgefield's staff noted, if there was a clinical concern, a more detailed evaluation of Mr. Frye's soft tissue for a radiographically occult foreign body (wood fragment) by computerized tomography (CT) scan may be warranted. Tr. 45, 67–69; PX 2 at 2513.

54.     Dr. Blocker also evaluated Mr. Frye on August 30, 2018. Tr. 65; PX 2 at 2340–41. Dr. Blocker noted that "X-rays taken but object does not appear." PX 2 at 2340. He also palpated the wound on Mr. Frye's face, noting: "[p]alpation of right jaw reveals a two-centimeter oblong shape subcutaneous foreign body." Tr. 67–68; PX 2 at 2340.

55.     Dr. Blocker then placed a call to Edgefield County Hospital to request a CT evaluation and possible foreign body removal by general surgery. Tr. 69; PX 2 at 2340. The hospital radiologist confirmed to Dr. Blocker that a wood fragment may not show on a regular x-ray film, and he recommended a CT scan or Ultrasound. Tr. 68–71, 556. According to Dr. Blocker's documentation, no general surgeon was available, and an ENT consult for removal was likely necessary. Tr. 69; PX 2 at 2340.

<u>Scheduling Outside Treatment</u>

56.     FCI Edgefield does not have a CT or Ultrasound machine, such that any scan must be conducted at an outside facility. Tr. 144. Normally, medical staff would have to submit a consult request to the Utilization Review Committee ("URC"), which determines priority and necessity of the request. Tr. 144. As the Clinical Director, however, Dr. Blocker could approve a consult request and contact an outside provider to schedule the consult, without going through other approval protocols. Tr. 146. Getting an appointment scheduled would depend on the outside radiologist's availability. Tr. 146–47.

57.     Once a consult is approved by the URC, HSA Salmon would receive it and send to NaphCare, a contract agency, which then schedules the appointment with the outside medical providers. Tr. 243–44, 788. For urgent consultations, FCI Edgefield sends the consult directly to NaphCare, rather than waiting for the URC's approval. Tr. 243.

58.     There are many factors in scheduling patients for outside medical treatment, including

balancing the medical needs of the prisoners with the public safety concerns of operating a prison. Tr. 791–92, 795.

<u>September 2018</u>

59.    On September 5, 2018, NP Sizemore evaluated Mr. Frye for complaints of wood that remained in his face. Tr. 74, 192–93; PX 2 at 2338–39. NP Sizemore's exam revealed a "palpable mass over the lower jawline that extends up below the right ear, unsure what the mass is, but it is possible that could be a piece of wood. The mass is approximately five centimeters in length. The area is not red or warm to touch, and no signs and symptoms of infection noted at this time." Tr. 75, 193; PX 2 at 2338–39. NP Sizemore also spoke with Mr. Frye about not touching his face because doing so could agitate the skin and allow for bacteria to get in. Tr. 205–06.

60.    After this examination on September 5, NP Sizemore requested an urgent radiology consultation for a CT scan of Mr. Frye's face. Tr. 71–72, 76; PX 2 at 2338. An urgent plastic surgery consultation was also requested for removal of the mass. Tr. 76–77; PX 2 at 2338. NP Sizemore set target dates for the CT scan for October 5, 2018, and surgery for November 5, 2018. DX 25 at 2338. NP Sizemore's exam revealed that there were no signs or symptoms of infection noted at the time. Tr. 193; PX 2 at 2338.

61.    On September 5, 2018, Mr. Frye also submitted a written complaint to FCI Edgefield relating to his care and treatment since the August 7 incident, indicating repeated requests to medical staff regarding the wood that remained in his face, and expressing that he was experiencing increased swelling in his jaw. Tr. 564–65.

62.    On September 10, 2018, Mr. Frye submitted a cop-out form requesting treatment for the pain in his jaw from the August 7 altercation. Tr. 196, 566; PX 8.

63.     On September 11, 2018, NP Sizemore received a sick call slip from Mr. Frye reporting that he still had a piece of wood under his skin on the right side of his face and requesting medication for pain related to his injury. Tr. 79; PX 2 at 2336. NP Sizemore spoke to Dr. Blocker who indicated ibuprofen and Tylenol were appropriate for the pain and noting Mr. Frye was pending a CT scan. Tr. 79, 197; PX 2 at 2336. No further medication was prescribed to address Mr. Frye's pain. Tr. 41–42, 80–81, 83.

64.     On September 11, 2018, Mr. Frye sent a letter to the warden, indicating that he did not feel like medical was doing their job and that they were dragging their feet. Tr. 559, 844. He reiterated that a piece of wood from a broken walking cane was lodged in his jaw on August 7, and that medical stitched his face up leaving three inches of wood embedded in his jaw. PX 2; Tr. 559–61. Mr. Frye reported that the wood fragment was causing discomfort and pain and was moving deeper into his jaw structure. Tr. 560. Mr. Frye reported complaints against specific staff, though these concerns were not shared with those staff at the time. Tr. 844–45.

65.     On September 13, 2018, Mr. Frye had blood work done. Tr. 222; DX 26 at 2450–51. The blood test results indicated Mr. Frye's white blood cell count was 6.2, which is in the normal range and suggested no infection at that time. Tr. 222–23; DX 26 at 2450–51.

66.     On September 14, 2018, Mr. Frye again requested pain medications because of the suspected foreign body in the right side of his face. Tr. 864. RN Thomas saw Mr. Frye that day and noted that a refill of Tylenol was given to him. Tr. 864; PX 2 at 2333.

67.     On September 17, 2018, NP Sizemore emailed NP Walton-Battle and Dr. Blocker a copy of the urgent plastic surgery consult that had been entered previously and inquired whether there was access to a plastic surgeon. Tr. 83–84; PX 57 at 4951. Dr. Blocker reported that Mr. Frye was discussed at morning meeting and was to be sent for a CT ASAP. Tr. 84; PX 57 at 4951.

That same day, Mr. Frye was transported to Edgefield County Hospital where a maxillofacial CT without contrast was performed by radiologist James Turner, MD ("Dr. Turner"). Tr. 89; PX 2 at 2502.

68.     Mr. Frye's CT scan report on September 17, 2018, did not reveal anything abnormal in his jaw. Tr. 89; PX 2 at 2503. Dr. Blocker called the radiologist and asked him to take another look at the scan because Dr. Blocker suspected there was a foreign body in Mr. Frye's right cheek, based on his examination. Tr. 89, 144.

69.     A subsequent review of the CT scan revealed a long thin foreign body in the subcutaneous tissues of Mr. Frye's right submandibular area. Tr. 89; PX 2 at 2502. On September 18, 2018, Dr. Turner addended his original report to indicate that a long thin foreign body was present in the subcutaneous tissues of Mr. Frye's right submandibular. Tr. 89–90. Dr. Turner further reported that the foreign body measured approximately 6 cm in length by 6 mm in diameter and was extending into Mr. Frye's parotid gland. Tr. 89–91. Given Mr. Frye's history, Dr. Turner determined the foreign body may represent a wood splinter. Tr. 89.

70.     According to Dr. Blocker, he began the process of securing an ENT or plastic surgeon to have the foreign body removed. He explained that "[w]hen attempting to get a consult, we tried the general surgeon. The general surgeon was not going to be available. We do have an ENT person specialist that comes into the institution to evaluate patients. He [the ENT]  was already on schedule to be coming in, so they tried to get him there." Tr. 87, ll. 8–15. Dr. Blocker believed Mr. Frye was not seen by the ENT because the ENT did not come to FCI Edgefield on the day he was scheduled. Tr. 88. Dr. Blocker initiated the consult process for Mr. Frye to be seen by a plastic surgeon and explained that the process of obtaining plastic surgery consults was challenging. Tr. 91.

71.    On September 20, 2018, an administrative note indicates Mr. Frye was requesting the results of his CT scan done the previous week, in accordance with his rights. Tr. 40, 94; PX 2 at 2331.

72.    On September 21, 2018, Mr. Frye sent a sick call note regarding increased pain and swelling in his jaw. Tr. 94, 167. Mr. Frye reported that it was painful to chew and stated the piercing wood had moved closer behind his ear and was causing a ringing sound. Tr. 94; PX 2 at 2330. Mr. Frye also requested the results from his CT scan. Tr. 95; PX 2 at 2330.

73.    RN Hawkes responded to Mr. Frye's request and saw him on September 21. Tr. 168. She documented that Mr. Frye was experiencing pain 5 out of 10, with tenderness in his jaw which began one month ago. Tr. 169. RN Hawkes scheduled a sick call triage for a midlevel provider to follow up with the patient. Tr. 171.

74.    On September 24, 2018, Mr. Frye again reported pain and complained that he still had a splinter of a cane lodged under his skin on the right side of his face. He also again requested the results of the CT scan he had on September 17. Tr. 95, 865; PX 2 at 2327. RN Thomas saw Mr. Frye on that date and requested that Mr. Frye be evaluated, which Dr. Blocker cosigned on September 24. Tr. 97, 865–66; PX 2 at 2327–28.

75.    On September 25, 2018, Mr. Frye woke up with pus and blood running down his face where the wound had opened. Tr. 567. He asked for medical to be contacted for an examination and was told they would see him when they came through the SHU. Tr. 569.

76.    On September 26, 2018, NP Sizemore examined Mr. Frye, following Mr. Frye's complaint of an infection on the right side of his face, drainage on his pillow overnight, and that the wood in his skin was causing an infection. Tr. 200; PX 2 at 2324. NP Sizemore directed that Mr. Frye be removed from his cell and placed in the SHU medical room. Tr. 627.

77.     NP Sizemore noted a localized infection in Mr. Frye's facial skin and subcutaneous tissue, reporting the area to be red and warm to the touch with the patient complaining of drainage. Tr. 98, 200–01; PX 2 at 2324–26. Mr. Frye's blood pressure was also elevated, which can be increased by infection, pain, and anxiety. Tr. 201–02; PX 2 at 2324–26.

78.     NP Sizemore prescribed an antibiotic for the infection and adjusted Mr. Frye's hypertension medication, in light of Mr. Frye's elevated blood pressure. Tr. 201; PX 2 at 2325. Mr. Frye had a history of hypertension, so it was hard to tell whether the elevation in his blood pressure was caused by his pain or was the result of his history of hypertension. Tr. 202.

79.     NP Sizemore did not consider the infection an emergency because Mr. Frye's temperature was not elevated, the infection was localized, and there were no signs that the infection was systemic. Tr. 230–31.

80.     During the encounter, NP Sizemore advised Mr. Frye of the results of the CT scan, which confirmed a foreign body in his face. Tr. 628–29. NP Sizemore informed Mr. Frye that he would be going for surgery. Tr. 628.

<u>September/October 2018</u>

81.     On September 25, 2018, HSA Salmon sent an email to Naphcare with the plastic surgery consult attached, with a message stating, "when you set this up, will you please have a doctor call and speak to Dr. Blocker." Tr. 254; PX 57 at 3498.

82.     That same day the Naphcare scheduler responded to HSA Salmon and outlined the process of scheduling a referral to the plastic surgeon, including that Dr. Blocker was to call the plastic surgeon first for a peer-to-peer conversation. Tr. 103–04, 256–57; PX 52 at 4125; PX 57 at 4125. The request was sent to Dr. Blocker on that same day. Tr. 104, 258–59; PX 52 at 4125. HSA Salmon explained that this was the first time he had ever seen a consultant request a peer-

to-peer discussion before scheduling an appointment, as normally the consult would be sent to the provider and they would schedule it. Tr. 274.

83.    On September 28, Naphcare emailed HSA Salmon asking whether there was an update from Dr. Blocker about the call to the plastic surgeon. Tr. 259. HSA Salmon had not heard from Dr. Blocker and forwarded the request and consult to Dr. Blocker again. Tr. 104, 259, 261; PX 57 at 4124.

84.    On October 3, there is another request for an update from Dr. Blocker on talking to the plastic surgeon about scheduling the urgent consult for Mr. Frye. Tr. 104, 261–62; PX 57 at 3951. HSA Salmon called Dr. Blocker, who said he would investigate it that day. Tr. 262. There is no indication Dr. Blocker ever called the plastic surgeon.

85.    On October 3, 2018, Dr. Blocker entered a medical note stating, "[s]poke with MD at the Burn Center of Augusta, . . . who has agreed to see this pt. When scheduled he will need to be NPO after 8:00 PM the night before surgery." DX 29 at 2324.

86.    As of October 3, 2018, Mr. Frye was scheduled for an appointment with Dr. Mullins at the Burn Center on October 15, 2018, at 8:00 a.m. Tr. 263–64; PX 57 at 3950.

87.    On October 7 and 8, 2018, Mr. Frye submitted forms indicating he was not being treated properly by medical, noting medical had not examined or even seen him, he was not given anything for his pain, and that the nursing and medical staff at FCI Edgefield knew he had a 6–7 cm piece of wood embedded under his facial skin but nothing was done to have it removed or ensure he received a higher level of care. Tr. 572–74; PX 2 at 2496–98.

<u>Surgery</u>

88.    Mr. Frye was scheduled for surgery to remove the foreign object on October 15, 2018. Tr. 111–12; PX 2 at 2491–92.

89.     The surgery was performed at Doctor's Hospital in Augusta, Georgia, on October 15,

2018. DX 30 at 0832, 0816, 0831, 2482, 2480. Mr. Frye's operative report stated:

> The scar overlying the foreign body was excised including a patch of alopecia.
> The large wooden fragment was removed. The wound was irrigated. The wound
> was closed with 4-0 prolene sutures with a Penrose drain sutured in place. The
> wound was dressed with ointment, gauze, and tape. The wound was cultured also
> prior to closure.

PX 5 at 86.

90.     In pertinent part, the surgery notes reflect:

> Pre-procedure diagnosis: Foreign body right face,
> Post-procedure diagnosis: same
> Procedure(s) performed:
> removal of foreign body
> excision and simple closure 4 cm right mandible Penrose drain
> 6 ml of 1% lidocaine with epinephrin DX 30 at 0832

DX 30 at 832.

91.     The final diagnosis stated, "foreign body, right face, excision: skin and subcutaneous

tissue with acute inflammation and edema, portion of wood received." DX 30 at 816. The

surgery notes also state that the specimen "consists of tan-brown wood, which appears pointed in

each end and measures 7.2 x 0.5 x 0.3 cm." DX 30 at 832.

92.      The discharge instructions were for Mr. Frye to "keep dressing clean and dry, and

intact." DX 30 at 2480.

93.     The charges for the surgery totaled $43,496.75. Tr. 115–16, 118, 373, 582–83; PX 6.

94.     Mr. Frye returned to Doctor's Hospital for one follow-up appointment where the surgeon

examined Mr. Frye and indicated the wound was healing well. Tr. 579; PX 5. Mr. Frye

understood the surgeon wanted to see him the following week for an additional follow-up,

though Mr. Frye was not taken back. Tr. 579. The charges for the follow-up appointment totaled

$250.75. Tr. 582; PX 6.

<u>Post Surgery</u>

95.    On October 15, 2018, RN Thomas saw Mr. Frye upon his return from surgery. Tr. 867; PX 2 at 2318–21. Mr. Frye had a bandage on his head and face and the incision site appeared to be clean, dry, and intact with no signs or symptoms of drainage through the bandage. Tr. 867; PX 2 at 2319. RN Thomas advised Mr. Frye of self-care instructions and provided antibiotics. Tr. 868; PX 2 at 2319.

96.    On October 18, 2018, RN Thomas treated Mr. Frye at the infirmary, noting that Mr. Frye "had removed his dressing and reported he took a shower. He was advised that he was specifically told not to get area wet and not to remove dressing. He was told to keep area CDI [clean, dry, and intact] upon arrival but he still took the bandages off and took a shower. The incision and drain seem to be WNL [within normal limits] and there is no s/s of infection or complications. There is a drain that is in place and not draining at the time of assessment." Tr. 870; PX 2 at 2317.

97.    On October 26, 2018, Dr. Blocker saw Mr. Frye for chronic care and follow up to the surgery. DX 33 at 2302–07. Dr. Blocker's assessment stated, "[l]ocalized swelling, mass and lump, head, R220 - Resolved – s/p extraction of foreign body on right side of face." DX 33 at 2306. Dr. Blocker's examination revealed that Mr. Frye was not reporting or showing symptoms of any acute complications with respect to the injury, that the surgery went according to expected outcomes without any complications, and that Mr. Frye was no longer complaining of any pain. Tr. 150–51; DX 33 at 2306. Dr. Blocker noted one of Mr. Frye's complaints was that he was angry towards medical staff for what he felt was a lack of medical treatment surrounding him having been hit with a cane and having a wood fragment surgically removed. Tr. 150; DX 33 at 2305.

98.    On October 26, 2018, RN Velez saw Mr. Frye at the SHU and he "removed 5 blue stitches from right lower jaw area." DX 33 at 2303. RN Velez's notes indicate that Frye denied pain. DX 33 at 2303.

99.    On October 30, 2018, Dr. Blocker signed a medical duty status report that cleared Mr. Frye for work with no restrictions. DX 34 at 2422.

## Facility Transfer

100.    On November 9, 2018, NP Walton-Battle reviewed Mr. Frye's medical record and prepared an "Inmate Intra-system Transfer" record, in preparation for Mr. Frye's transfer date of November 15, 2018. DX 30 at 2381–83.

101.    Mr. Frye transferred from FCI Edgefield to FCI Gilmer, West Virginia, in November of 2018. Tr. 603, 530. He was later transferred to FCI Schuylkill, Pennsylvania, which was his location at the time of trial. Tr. 530.

## FCI Gilmer

102.    Dr. Anderson saw Mr. Frye in December 2018 at FCI Gilmer for a Chronic Care Clinic Intake Encounter. Tr. 939; DX 39 at 2288–93.

103.    During this exam, Mr. Frye's concerns were his diagnosis of hypertension, diabetes, high cholesterol, the hepatitis C virus, and his orthopedic issues predominantly pertaining to his knees. Tr. 940–41; DX 39 at 2288.

104.    Also during the December exam, Dr. Anderson reviewed Mr. Frye's medical history, which included his various diagnoses and chronic issues. Tr. 942. Dr. Anderson resolved many of the diagnoses, meaning if Mr. Frye was not having any ongoing issues under a particular diagnosis, it would be categorized as resolved and no longer necessary to continue treating. Tr. 942.

105.   Dr. Anderson specifically resolved the following issues related to Mr. Frye's jaw injury: head-superficial injury, injury-face, and local infection of the skin and subcutaneous tissue. Tr. 943; DX 39 at 2289. Mr. Frye did not indicate to Dr. Anderson that he was experiencing any pain with respect to his jaw or his cheek or anything in the area surrounding the surgical sight. Tr. 944.

106.   Dr. Anderson also discontinued a prior consultation request for the plastic surgeon because Mr. Frye expressed no concern about the surgery nor identified any pain he was experiencing. Tr. 945; DX 39 at 2291.

107.   On March 11, 2019, FCI Gilmer medical staff saw Mr. Frye for a complaint that he was "stabbed with wood in his jaw last year, had surgery October 2018, and sometimes he has discomfort in his right ear." Tr. 948–49; PX 1D at 2539–40.

108.    Dr. Anderson ordered a hearing test, which was conducted on March 11, 2019, and reviewed by Dr. Anderson on March 14, 2019. Tr. 950–51; PX 1E at 2760–63. The test revealed that Mr. Frye had "some bilateral hearing loss, both ears." Tr. 950–51; PX 1E at 2760–63.

109.   According to Dr. Anderson, the results appeared to be from the "effects of aging . . . because as we get older there are, for multiple reasons, people's hearing loss tends to progress." Tr. 951–52.

110.   Dr. Anderson noted there appeared to be no prior hearing tests conducted on Mr. Frye. Tr. 963. Because there were no prior hearing tests results to compare, the test performed on March 11, 2019, signifies there is a hearing deficiency, not necessarily a hearing loss. Tr. 964.

111.   Dr. Anderson did not have any concerns about Mr. Frye's hearing at that point, which would have necessitated additional medical care. If the hearing issues were to affect Mr. Frye's daily living, he could put in a sick-call request and receive additional care. Tr. 952–53.

112.    On April 1, 2019, Dr. Anderson saw Mr. Frye during a Chronic Care Clinic encounter;

one of Mr. Frye's chief concerns was discussing whether Dr. Anderson thought someone would

be "medically negligent" for not finding a piece of wood under the skin following a "stabbing."

Tr. 954; PX 1F at 2534. During this encounter and discussion, Mr. Frye did not complain to Dr.

Anderson about any pain or issues with respect to the incident. Tr. 958.

### Expert Testimony

113.    Plaintiff produced as an expert witness, Terrance L. Baker, M.D., a board-certified

physician since 1984 who is licensed in North Carolina, Maryland, and Kenya, Africa. Tr. 296.

Dr. Baker was qualified as an expert regarding the standard of care for physicians, physician

extenders to include physician's assistants, and nursing. Tr. 331–32.

114.    Dr. Baker testified that the care and treatment of Mr. Frye by FCI Edgefield's medical,

nursing, and non-licensed provider staff fell below the applicable standards of care. Tr. 332. Dr.

Baker testified that there was (1) a failure to take an adequate history of Mr. Frye's facial injury

initially to understand the mechanism of the injuries that included a retained wood foreign body;

(2) a failure to refer Mr. Frye for further evaluation of the facial injury he sustained and the

likelihood of a retained foreign body or injury to the underlying facial structures, including

radiographic images, at the initial evaluation and afterward; (3) a failure to coordinate the

necessary care with a specialist; (4) a failure to timely secure treatment of the patient's facial

wound with the retained foreign body and to timely address the patient's infection; and (5) that

as Mr. Frye worsened over the days and months, there was a failure to respond to his changing

needs on a timely basis. Tr. 333–37, 345.

115.    Dr. Baker opined that Mr. Frye was in an emergent medical condition and that Dr.

Blocker's failure to recognize the underlying complications of Mr. Frye's injury, and the

repeated failures of Dr. Blocker and the nursing staff in the months that followed to recognize Mr. Frye's worsening condition and to timely coordinate a higher level of care to remove the foreign body, fell outside of any reasonable standard of care and was negligent. Tr. 335–36, 340, 344.

116.    Dr. Baker testified that the standard of care required Mr. Frye to be seen urgently for removal of the foreign body and treatment of any infection. For as long as the foreign body remained, the infection would reasonably be expected to worsen. Tr. 347, 354–55, 409.

117.    Dr. Baker testified that x-rays are an adequate screening tool for fractures and some types of soft tissue injuries, but that they do not reveal wooden retained foreign bodies. Tr. 338. He testified that, once the x-ray was taken and revealed nothing, a CT scan should have been ordered that day. Tr. 339. According to Dr. Baker, the standard of care would have required a CT scan to evaluate not only for retained parts of the cane but also to evaluate for blood vessel structure injuries and nerve injuries. Tr. 339.

118.    Dr. Baker testified that the continuing evaluations after that, by Dr. Blocker and other health care providers, fell below the standard of care because of the failure to timely get necessary imaging and/or refer the patient to a higher level of care, including seeing a surgeon for removal of the retained wood. Tr. 342–43.

119.    Dr. Baker testified that the standard of care required Dr. Blocker and either of his physician's assistants to continue serial examinations of Mr. Frye to make sure his condition was being adequately evaluated and treated and that the necessary imaging, laboratory testing, and referral to an appropriate specialist were all occurring within a timely basis. Tr. 346.

120.    Dr. Baker also testified that the nursing staff had a non-delegable duty to ensure that Mr. Frye had serial examinations that were necessary and that he was receiving treatment for the

infection in his face. Tr. 346. He testified that the physician's assistants and physician had independent, non-delegable duties to make sure Mr. Frye's infection was being adequately treated. According to Dr. Baker, they all were responsible for getting the foreign body removed, under the standard of care. Tr. 347.

121.    Dr. Baker testified that a retained infected foreign body in a diabetic's face is a medical emergency. Tr. 355.

122.    When questioned by Defendant's counsel about whether Mr. Frye had a medical emergency by September 26 to a reasonable degree of medical certainty, he responded that Mr. Frye had an abscess in his face, a pocket of pus, and a retained foreign body, which more likely than not significantly contributed to the elevated blood pressure that day. Tr. 409–10.

123.    It was the opinion of Dr. Baker that the actions or inactions of the medical and nursing staff at FCI Edgefield caused harm to Mr. Frye. Tr. 365. Based upon his review of the medical records, Mr. Frye's testimony, and the testimony of other witnesses, it was his opinion that Mr. Frye sustained injuries, including the retention of a wooden foreign body that was allowed to stay in his face, which continued to cause soft tissue injury, infection abscess, pain, loss of hearing and/or discomfort to right ear, insomnia due to pain and swelling, painful mastication, post-surgery pain, signs and symptoms of facial neuropathy, anxiety and depression, and post-traumatic stress syndrome symptoms. Tr. 365–66, 417, 444, 450, 453.

124.    Dr. Baker opined that had Mr. Frye experienced an adequate examination on August 7, 2018, more likely than not and within a reasonable degree of medical certainty the pain he experienced, the creation of the abscess, and the continued diminution of damage of the tissue around the retained foreign body would not have occurred. Tr. 366. Mr. Frye not only experienced significant worsening of and damage to the soft tissue of his face because of the

retained body and the infection that surrounded it, the required surgical procedure was more complex and lengthier in nature to treat the damage that occurred. Tr. 367, 369.

125.     Dr. Baker testified that the only option to treat Frye was "removal of the foreign body . . . the standard of care requires the foreign body to be removed. There is no other treatment." Tr. 340, ll. 6–14.

126.     Dr. Baker testified that, had the wood been removed on a timely basis, the subsequent damage, including inflammation, swelling, pain, and disability that Mr. Frye experienced more likely than not within a reasonable degree of medical certainty would not have occurred. Tr. 367–68.

127.     Dr. Baker indicated the damages to Mr. Frye include the following: sewing the wood in Mr. Frye's face, Tr. 365; infection allowed to occur, Tr. 365; carotid gland "may have suffered injury," Tr. 365; loss of hearing "is reported," Tr. 365; insomnia due to pain, Tr. 366; facial neuropathy, injury to nerves of face, Tr. 366; anxiety and depression, Tr. 366; painful mastication, Tr. 366; and a surgery that was "more complex and more lengthy in nature" Tr. 367. Dr. Baker testified that if surgery had been done earlier, it would have been done locally or in the ER, not in an operating room. Tr. 368.

128.     Defendant's expert, Dr. Steyer, testified that Mr. Frye's presentation was not life threatening or an emergency during the entire period of August 7, 2018, through the surgery on October 15, 2018. Mr. Frye's condition was not life threatening for the medical encounter on August 7, 2018. Tr. 468. Dr. Steyer testified that Mr. Frye's presentation on September 5, 2018, was not an emergency. And there was nothing to elevate suspicion, "[a]gain, no reports of any signs or symptoms of infection at this point in time to raise that or elevate that up to another level of care needed." Tr. 478–79.

129.    Dr. Steyer explained, to a reasonable degree of medical certainty, why Mr. Frye never presented an emergency situation. Tr. 497–98. Dr. Steyer stated that, Mr. Frye "did not have severe trauma that would require acute or emergent care . . . he was receiving medically necessary non-emergency care." Tr. 500, ll. 4–10. He also disagreed with Dr. Baker's opinion that Mr. Frye's status was acute or emergent, stating that at the time of the injury "patient was awake, there was no loss of consciousness, there was no signs or symptoms of increase intracranial pressure. There were multiple excoriations and contusions noted on the head, on the face and on the shoulders, but there was no sign that any of those were life threatening or urgent." Tr. 500, ll. 18–23.

130.    Dr. Steyer testified that at "times foreign objects in the body can work themselves out on their own." Tr. 478, ll. 12–16. Dr. Steyer also testified that BOP providers acted appropriately, including "waiting to see if the foreign body would come out on its own naturally to avoid surgery." Tr. 497, ll. 22–24

## CONCLUSIONS OF LAW

Based upon the Findings of Fact stated above, the Court makes the following Conclusions of Law:

1.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1402.

2.     Pursuant to 28 U.S.C. § 1391(b)(2) and Local Civil Rule 3.01(A)(1) (D.S.C.), venue is proper in this Court because a substantial part of the events or omissions giving rise to Mr. Frye's claims occurred in the Greenwood Division of the United States District Court for the District of South Carolina.

3.     The United States is the proper defendant in this action pursuant to the FTCA, 28 U.S.C. §§ 1346(b)(1), 2671–80. The BOP medical providers were acting within the course and scope of

their federal employment during the time they provided medical treatment to Mr. Frye. *See* 28 U.S.C. § 2679(b)(1).

4.    The FTCA imposes tort liability on the United States only "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and only to the extent that "a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred," *id.* at § 1346(b)(1). The FTCA is a limited waiver of sovereign immunity, and therefore courts must strictly interpret and apply it. *United States v. Sherwood*, 312 U.S. 584, 590 (1941); *Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 741 (4th Cir. 1990).

5.    Under the FTCA, procedural matters are governed by federal law; however, the FTCA directs courts to examine substantive legal issues pursuant to the laws of the place where the act or omission occurred. *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991) ("A plaintiff has an FTCA cause of action against the government only if she would also have a cause of action under state law against a private person in like circumstances."). State law determines whether there is an underlying cause of action. *Id.*

6.    In this case, South Carolina law governs this action because South Carolina is the site of the alleged medical malpractice. 28 U.S.C. § 1346(b)(1).

7.    As the courts in this district have held, to establish liability in a medical malpractice case under South Carolina law, Plaintiff must prove by a preponderance of the evidence the following elements:

> a)    What the recognized and generally accepted standards, practices and procedures are in the community which would be exercised by competent physicians in the same specialty under similar circumstances;
>
> b)    The physician or physicians and/or hospital personnel in question negligently deviated from the generally accepted standards, practices, and procedures;

c)     Such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiff's injury; and

d)     The plaintiff was injured.

*Dumont v. United States*, 80 F. Supp. 2d 576, 581 (D.S.C. 2000) (citing *Green v. Lilliewood*, 249 S.E.2d 910 (S.C. 1978)); *see also Brouwer v. Sisters of Charity Providence Hosps.*, 763 S.E.2d 200, 203 (S.C. 2014) (citations omitted); *David v. McLeod Reg'l Med. Ctr.*, 626 S.E.2d 1, 3–4 (S.C. 2006). Plaintiff bears the burden of proof throughout. *Dumont*, 80 F. Supp. 2d at 581.

8.     A licensed healthcare provider commits malpractice by "not exercising that degree of skill and learning that is ordinarily possessed and exercised by members of the profession in good standing acting in the same or similar circumstances." *David*, 626 S.E.2d at 3.

9.     Under South Carolina law, "[a] physician or surgeon is not an insurer of health, and he is not required to guarantee results. He undertakes only to meet the standard of skill possessed generally by others practicing in his field under similar circumstances." *Dumont*, 80 F. Supp. 2d at 581.

10.     A "plaintiff must provide expert testimony to establish both the required standard of care and the defendants' failure to conform to that standard, unless the subject matter lies within the ambit of common knowledge so that no special learning is required to evaluate the conduct of the defendants." *David*, 626 S.E.2d at 4.

11.     Negligence (sometimes referred to as "ordinary" negligence) requires that a plaintiff show "(1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damages proximately resulting from the breach." *Crolley v. Hutchins*, 387 S.E.2d 716, 717 (S.C. Ct. App. 1989).

12.     Administrative acts whose performance requires no professional knowledge, skill, or expert experience can constitute negligence and do not require expert testimony. No expert

testimony is needed if the subject matter lies within the ambit of common knowledge and experience, so that no special learning is needed to evaluate the conduct of the defendant. *See Brouwer*, 763 S.E.2d at 204; *Pederson v. Gould*, 341 S.E.2d 633, 634 (1986).

13.     The South Carolina Supreme Court instructed that "[p]roximate cause requires proof of (1) causation in fact and (2) legal cause." *Bramlette v. Charter-Medical-Columbia*, 393 S.E.2d 914, 916 (S.C. 1990); *Hill v. York County Sheriff's Dep't*, 437 S.E.2d 179, 182 (S.C. Ct. App. 1993). "Proximate cause does not mean the sole cause; [t]he defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury." *Small v. Pioneer Mach. Inc.*, 494 S.E.2d 835, 843 (S.C. Ct. App. 1997).

14.     To establish causation in fact, the plaintiff must show that the injury would not have occurred "but for" the defendant's negligence. *Hanselmann v. McCardle*, 267 S.E.2d 531, 532–33 (S.C. 1980); *see also Bramlette*, 393 S.E. 2d at 916.

15.     To establish legal cause, the plaintiff must prove foreseeability. *Young v. Tide Craft, Inc.*, 242 S.E.2d 671, 675 (S.C. 1978). The standard by which foreseeability is determined is that of looking to the natural and probable consequences of the complained of act. *Id.* It is not necessary that the actor must have contemplated or could have anticipated the particular event that occurred. *Id.* In determining whether a consequence is one that is natural and probable, the actor's conduct must be viewed in the light of the attendant circumstance. *Id.*

16.     A plaintiff proves legal cause by establishing the injury in question occurred as a natural and probable consequence of the defendant's negligence. *Bramlette*, 393 S.E.2d at 916.

17.     Expert testimony is generally required to establish proximate cause in a medical malpractice case. *Id.* The "expert testimony as to proximate cause must provide a significant causal link between the alleged negligence and the injuries suffered, rather than a tenuous and

hypothetical connection." *Martasin v. Hilton Head Health Sys.*, 613 S.E.2d 795, 800 (S.C. Ct. App. 2005).

18.    "Expert testimony is not required, however, to prove proximate cause if the common knowledge or experience of laypersons is extensive enough to determine the presence of the required causal link between the medical treatment and the patient's injury." *Bramlette*, 393 S.E.2d at 916–17.

19.    Under Federal Rules of Evidence 104(a) and 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–93 (1993). The Court acts as a gatekeeper "to verify that expert testimony is based on sufficient facts or data." *E.E.O.C. v. Freeman*, 778 F. 3d 463, 472 (4th Cir. 2015) (Agee, J., concurring) (quotations omitted). The trial court must ensure that (1) "the testimony is the product of reliable principles and methods," (2) "the expert has reliably applied the principles and methods to the facts of the case," and (3) the "testimony is based on sufficient facts or data." Fed. R. Evid. 702(b), (c), (d). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," *Daubert*, 509 U.S. at 592–93, and whether the expert has "faithfully appl[ied] the methodology to facts," *Roche v. Lincoln Prop. Co.*, 175 F. App'x 597, 602 (4th Cir. 2006).

20.    Under the FTCA, damages are determined by the law of the state where the tortious act was committed, subject to the limitation that the United States shall not be liable for interest prior to judgment or for punitive damages. 28 U.S.C. § 2674.

21.    A plaintiff's potential damages can include past and future medical expenses, past and future loss of income, loss of family services, pain and suffering, loss of enjoyment of life, mental anguish, and disfigurement. *Boan v. Blackwell*, 541 S.E.2d 242, 243 (S.C. 2001);

*Woodberry v. United States*, C/A No. 2:12-1872-DCN, 2015 WL 4395154, at *6 (D.S.C. July 16, 2015). "[T]he existence or amount of damages may not be left to conjecture, speculation[,] or guess." *Pearson v. Bridges*, 544 S.E.2d 617, 619 n.5 (S.C. 2001).

22.    A plaintiff in a negligence action is entitled to recover all damages proximately resulting from a defendant's negligent acts, including the aggravation of pre-existing conditions. *Watson v. Wilkinson Trucking Co.*, 136 S.E.2d 286, 291 (S.C. 1964); *Roberson v. United States*, C/A No. 4:09-00491-RBH, 2010 WL 4822325, at *11 (D.S.C. Nov. 22, 2010).

23.    "Future damages are only recoverable if they are 'reasonably certain' to occur." *Woodberry*, 2015 WL 4395154, at *6; *Pearson*, 544 S.E.2d at 619. "A party need not, however, prove future damages in a personal injury case to a mathematical certainty." *Campbell v. Paschal*, 347 S.E.2d 892, 901 (S.C. Ct. App. 1986).

24.    A party injured by the acts of another is required to do those things a person of ordinary prudence would do under the circumstances. *Baril v. Aiken Reg'l Med. Ctrs.*, 573 S.E.2d 830, 838 (S.C. Ct. App. 2002). "Whether the party acted reasonably to mitigate damages is ordinarily a question for the [factfinder]." *Id.* In determining whether a plaintiff has failed to mitigate damages, the court can consider whether that person has failed to follow the advice of their physician or other treating professional. *In re Air Crash Disaster at Charlotte, N.C. on July 2, 1994*, 982 F. Supp. 1115, 1128 (D.S.C. 1997).

25.    Under South Carolina law, a plaintiff in a negligence action has the burden of proving that the injury was caused by the actionable conduct of the particular defendant. *Ryan v. Eli Lilly & Co.*, 514 F. Supp. 1004, 1018 (D.S.C. 1981). Moreover, each party's recovery must be diminished in proportion to his fault and negligence in causing the worsening of the existing injuries. *See Nelson v. Concrete Supply Co.*, 399 S.E. 2d 783, 784 (S.C. 1991).

26.     Under South Carolina's comparative negligence system, all forms of conduct amounting to negligence in any form, including, but not limited to, ordinary negligence, gross negligence, and reckless, willful, or wanton conduct, may be compared to and offset by any conduct that falls short of conduct intended to cause injury or damage. *Berberich v. Jack*, 709 S.E.2d 607, 615 (S.C. 2011). By this method, each party's relative fault in causing the plaintiff's injury will be given due consideration. *Id.* Any negligence by the plaintiff that contributed to the injury may be compared by the factfinder in its assessment of fault. *See id.* at 616 ("The relative significance of each party's conduct and its overall contribution to the plaintiff's injury are accounted for in the offsets inherent in our comparative negligence system.").

Liability

27.     The Court finds the testimony of Plaintiff's expert, Dr. Baker, relevant and reliable, in accordance with Federal Rules of Evidence 104(a) and 702. The Court also finds his testimony generally to be more credible than Defendant's expert, except as noted herein.

28.     The Court finds that Plaintiff offered sufficient expert testimony to establish by the greater weight of the evidence the standard of care applicable in this case to the various healthcare providers at FCI Edgefield, as well as to establish a breach of the standard of care.

29.     The Court finds Plaintiff's expert credibly defined the standard of care applicable to the medical and nursing staff at FCI Edgefield. The Court finds that the medical and nursing staff had a duty to Mr. Frye to timely and adequately assess Mr. Frye; timely and adequately diagnose Mr. Frye's facial injury and recommend or refer Mr. Frye for imaging studies, including a CT scan; timely and adequately refer Mr. Frye to a higher level of care for complete evaluation and treatment; and timely and adequately coordinate necessary care for Mr. Frye and secure treatment and surgical removal of the retained foreign object in his right jaw.

30.     The Court is mindful that, when coordinating outside medical treatment for an inmate, one must weigh the safety of the public, prison staff, and inmates. Tr. 796. However, in this instance, the evidence shows that, as of August 12, 2018, Mr. Frye was complaining that he had pulled a wood fragment out of his jaw and that the X-ray taken on August 13, 2018, did not reveal any breaks or other issues with his jaw. At that time, particularly given that Dr. Blocker knew an X-ray would not reveal a wood fragment, a CT scan should have been ordered. However, a second X-ray was ordered on August 30, 2018, and a CT scan was not ordered until September 17, 2018, over thirty days after the original X-ray.

31.     Moreover, after the CT scan revealed a foreign object in Mr. Frye's jaw, surgery was not until almost 30 days later, on October 15, 2018. No credible explanation has been provided for ordering a second X-ray, for the delay in ordering a CT scan, or for the delay in surgery.

32.     The medical experts presented conflicting testimony as to whether Mr. Frye's medical needs were emergent. On this issue, the Court is unpersuaded by Dr. Baker's testimony that Mr. Frye's injury presented a medical emergency, *see* Tr. 355, 409–10, and finds persuasive Dr. Steyer's testimony that Mr. Frye's presentation was not life threatening or an emergency during the entire period of August 7, 2018, through the surgery on October 15, 2018, *see* Tr. 468, 497–98, 500. There is evidence that Mr. Frye's medical needs were urgent, as defined by BOP Policy. Most notably, Defendant by-passed the URC approval process for scheduling outside consultations, indicating that treatment was urgent. However, to the extent that the delay in treatment or treatment of Mr. Frye violated any BOP policy, those violations are consistent with and no greater than the breach in the standard of care.

33.     Overall, the Court finds that the nursing and medical staff failed to provide care and treatment within the standard of care from the delay in providing care and/or securing treatment for the foreign body embedded in Mr. Frye's right jaw.

34.     While Dr. Baker opined that the initial examination of Mr. Frye fell below the standard of care on August 7, 2018, the Court disagrees. There is no credible evidence before the Court that, on August 7, 2018, Dr. Blocker or any other member of the health services team knew, would know, or should have known that Mr. Frye had a wooden fragment in his jaw.

35.     However, the Court agrees that, as of August 13, 2018, after Mr. Frye complained of wood embedded in his jaw, the medical provider noted a palpable lump in Mr. Frye's jaw, and the X-ray taken on that date did not reveal anything, a CT scan should have been ordered for Mr. Frye at that time.

36.     The Court finds the delay in ordering the CT scan resulted in a foreseeable delay in discovering or confirming the wooden fragment in Mr. Frye's jaw and further delayed the surgery to remove it, during which time Mr. Frye suffered an infection. This delay was a breach in the standard of care.

37.     The Court also finds that the delay in scheduling the surgery after confirming a foreign body was in Mr. Frye's jaw was a breach in the standard of care.

38.     Defendant suggests that Mr. Frye's negligence may have contributed to the injuries in this case, most notably with regard to the infection that developed as of September 26, 2018. The Court disagrees with Defendant. There is no credible evidence before the Court to support the contention that any negligence, or other conduct, by Mr. Frye caused or contributed to the infection that developed in his jaw or otherwise. *See Berberich*, 709 S.E.2d at 615; *see also Woodberry*, 2015 WL 4395154, at *5 (finding plaintiff was not comparatively negligent).

39.    In accordance with the foregoing, the Court finds and concludes that Plaintiff has met his burden of proof to establish Defendant's liability.

Proximate Cause and Damages

40.    Mr. Frye seeks to recover economic loss damages for the cost of medical services provided to him, specifically the costs of the surgery for removal of the wooden fragment in his jaw and the follow up appointment. However, Mr. Frye's need for surgery was caused by the initial altercation with his cell mate at the jail, not by the breaches in the standard of care. The malpractice in this case was not the proximate cause of Mr. Frye's need for surgery. *See Hanselmann*, 267 S.E.2d at 532–33; *see also Bramlette*, 393 S.E. 2d at 916.

41.    Dr. Baker testified that the surgery was more expensive because of the delay: if surgery had been done earlier, it would have been done locally or in the ER, not in an operating room, and, thus, less expensively. However, Dr. Baker is not board certified in surgery or plastic surgery. Tr. 388–89. There is no credible evidence before the Court to support this testimony, nor is there any evidence to establish the purported difference between the costs of surgery.

42.    Mr. Frye also seeks to recover damages for hearing loss. He testified that "my hearing, my hearing in my right ear is going down a lot. It's real low." Tr. 583, ll. 17–19. However, there is no credible evidence before the Court that any hearing loss of Mr. Frye was proximately caused by any breach in the standard of care.

43.    Dr. Baker testified that Mr. Frye's purported hearing loss, within a reasonable degree of medical certainty, "is related to the abscess formation in his face and the retention of the foreign body." Tr. 443, ll. 13–17. However, Dr. Baker is not board certified as an ear, nose, and throat (ENT) physician. Tr. 442. Additionally, he testified that he does not know if Mr. Frye has

38

hearing loss. Tr. 443. Most importantly, Dr. Baker did not use the word "cause" when discussing Mr. Frye's hearing loss.

44.     The credible evidence before the Court is that Mr. Frye had a hearing test on March 11, 2019, when he was at FCI Gilmer, which was reviewed by Dr. Anderson on March 14, 2019. Tr. 950–51; PX 1E at 2760–63. The test revealed that Mr. Frye had "some bilateral hearing loss, both ears." Tr. 950–51; PX 1E at 2760–63. There were no prior hearing tests results to compare for Mr. Frye. Tr. 964.

45.     The evidence before the Court is that Plaintiff has some hearing loss in both ears, not just the ear on the right side, such that Plaintiff has not established that his hearing loss was proximately caused by the breach in the standard of care.

46.     Mr. Frye also seeks to recover damages for past, present, and future pain and suffering, disfigurement, mental anguish, mental distress, anxiety, emotional injury, depression, and loss of enjoyment of life.

47.     With regard to disfigurement, Mr. Frye is claiming damages related to the scarring on his face. He testified that "my face is a little deformed right here where my chin poked in some because the dead flesh they had to cut out. They had to cut out a chunk of flesh about this thick because all of my hair on my face right there, it got bald. And if that would have happened on the 13th or before then, my injury wouldn't occurred to me as it did, where I had to go have a surgery, got a scar on my face for life." Tr. 563, ll. 3–11.

48.     There is no credible evidence before the Court that any scarring on Mr. Frye's face was proximately caused by any breach in the standard of care. Mr. Frye was stabbed in the face by his cell mate, causing the initial injury. At the time Mr. Frye was attacked by his cell mate, Mr. Frye had a beard, which Dr. Blocker had to shave to put a stich in his face. Tr. 534, 537; Joint

Exhibit No. 48 at 2890–98. At the time the surgery was performed, Mr. Frye had a scar on his face, as evidenced by the post-operative notes: "The scar overlying the foreign body was excised including a patch of alopecia." PX 5 at 86.

49.    With regard to loss of enjoyment of life, there is no credible evidence or testimony before the Court regarding any inability to participate in normal activities of daily living prior to the injury at hand. Damages for past, present, and future loss of enjoyment of life are meant to "compensate for the limitations, resulting from the defendant's negligence, on the injured person's ability to participate in and derive pleasure from the normal activities of daily life, or for the individual's inability to pursue his talents, recreational interests, hobbies, or avocations." *Boan v. Blackwell*, 541 S.E.2d 242, 244 (S.C. 2001) (where there is evidence of "loss of enjoyment of life," such loss is a compensable element, separate and apart from pain and suffering, of a damages award). Accordingly, Mr. Frye is not entitled to any damages award for loss of enjoyment of life.

50.    Mr. Frye is entitled to damages for mental anguish and pain and suffering. "An award for pain and suffering compensates the injured person for the physical discomfort and the emotional response to the sensation of pain caused by the injury itself." *Id.* "Separate damages are given for mental anguish where the evidence shows, for example, that the injured person suffered shock, fright, emotional upset, and/or humiliation as the result of the defendant's negligence." *Id.* When connected with a physical injury, the term "mental anguish" includes both the resultant mental sensation of pain and also the accompanying feelings of distress, fright, and anxiety. 22 Am. Jur. 2d Damages § 223.

51.    "[F]uture pain and suffering on the part of the injured person in consequence of the injury constitute a proper element of the damages which may be allowed provided there is the requisite

certainty or probability that such pain and suffering will result." *Id.* § 216. Similarly, an award for mental anguish "may cover not only the mental suffering prior to the trial but also the suffering which is reasonably probable to occur in the future." *Id.* § 224. "Future damages in personal injury cases need not be proved to a mathematical certainty." *Haltiwanger v. Barr*, 186 S.E.2d 819, 821 (S.C. 1972).

52.     As for the pain and suffering and the mental anguish that Mr. Frye endured, there was a delay of 36 days between the initial X-ray on August 13, 2018, and the CT scan on September 17, 2018. Moreover, there was a delay of 28 days between the CT scan and Mr. Frye's surgery.

53.     The Court is cognizant that it may take some time to schedule a CT scan and surgery, when balancing all the factors in scheduling patients for outside medical treatment. Tr. 791–92, 795. However, in this instance, even Defendant acknowledges that the need for treatment was urgent, when it bypassed the URC approval process. Tr. 243. Overall, the Court finds that Plaintiff endured a delay of approximately 60 days because of the breaches in the standard of care.

54.     The pain, suffering and mental anguish that Mr. Frye endured over this period were proximately caused by the breaches in the standard of care. Credible evidence presented at trial established that Mr. Frye experienced increasing pain, suffering, and mental anguish as the delay persisted, and he made repeated attempts to contact various officials, including the warden, in order to voice his growing concerns and get the medical attention he knew he needed.

55.     Regarding any future pain and suffering, there is either no credible evidence before the Court to support any such claims or they are too speculative, as set forth herein.

56.     Notably, while Mr. Frye testified that he feels a little "nauseated in my jaw and stuff" when the weather changes, he testified that he does not "have as much swelling now." Tr. p. 587,

ll. 21–25, p. 588, ll. 7–8, p. 675, l. 5. For calendar year 2022, Mr. Frye had not received medical treatment for anything associated with this injury. Tr. 672.

57.     The evidence before the Court indicates that Dr. Anderson saw Mr. Frye in December of 2018, two months after his surgery, and resolved the following issues related to Mr. Frye's jaw injury: head-superficial injury, injury-face, and local infection of the skin and subcutaneous tissue. Tr. 943; DX 39 at 2289. Mr. Frye did not indicate to Dr. Anderson then that he was experiencing any pain with respect to his jaw or his cheek or anything in the area surrounding the surgical sight. Tr. 944.

58.     Dr. Anderson also discontinued a prior consultation request for the plastic surgeon because Mr. Frye expressed no concern about the surgery nor identified any pain he was experiencing. Tr. 945; DX 39 at 2291.

59.     There is no doubt that Mr. Frye suffered an injury to his jaw at the hands of an attack by his cell mate. However, there is no credible evidence before the Court to determine with any certainty what future pain Mr. Frye may suffer as a result of the initial injury, versus any breach of the standard of care in this case. To that end, any future damage for pain and suffering is too speculative to award.

60.     For these reasons, the Court finds that the evidence does not support an award for any future pain and suffering.

61.     As for future mental anguish and distress, although Dr. Baker stated that Mr. Frye's current health problems include anxiety, depression, and posttraumatic stress syndrome, he has not conducted an independent medical exam (IME) on Mr. Frye nor examined Mr. Frye. Tr. 442, 444. Dr. Baker was not able to explain what percentage of Mr. Frye's anxiety may be attributable

to the delay in removing the fragment from Mr. Frye's jaw, versus other factors, because that would require an IME. Tr. 446.

62.     Nevertheless, Mr. Frye credibly testified that he does not sleep normally, and that "days I feel when I think about it I get depressed. I feel anxiety. I get emotion because I keep saying, this shouldn't have happened. But I got to deal with it." Tr. 589, ll. 21–25. Accordingly, the Court finds that there is evidence to support an award for future mental anguish.

63.     As for any other category of damages, the Court finds either no evidence to support the claims or that they are too speculative. Mr. Frye did not testify or offer credible evidence of future medical expenses. Mr. Frye did not testify or offer any evidence as to either past or future loss of income. Mr. Frye also did not testify and/or offer evidence as to loss of family services. *See Woodberry*, 2015 WL 4395154, at *6; *Bates v. Merritt Seafood, Inc.*, 663 F. Supp. 915, 935 (D.S.C. 1987); *Pearson*, 544 S.E.2d at 619 n.5.

<u>Damages Award</u>

64.     When final judgment is rendered against a single health care institution in an action on a medical malpractice claim, civil liability for noneconomic damages is limited to an amount not to exceed $512,773.[4] The limitations for noneconomic damages rendered against any health care provider or health care institution do not apply if the jury or court determines that the defendant was grossly negligent, willful, wanton, or reckless, and such conduct was the proximate cause of the claimant's noneconomic damages.

65.     The Court does not find sufficient credible evidence of any grossly negligent, willful, wanton, or reckless conduct in this case, such that the limit of civil liability for noneconomic damages applies.

---

[4] Pursuant to S.C. Code Ann. § 15-32-220(F), the limit on civil liability for noneconomic damages on a medical malpractice claim is adjusted each year based on inflation.

66.    In the present case, bearing in mind the evidence, testimony presented, and the applicable limits on damages, the Court concludes that Plaintiff is not entitled to any economic loss damages.

67.    The Court further concludes that Plaintiff is entitled to recover noneconomic damages for his pain and suffering from the breaches in the standard of care identified herein, as well as the mental anguish he suffered and will suffer in the future as a result of the breaches in the standard of care. [5]

68.    "Pain and suffering have no market price" and "are not capable of being exactly and accurately determined." *Edwards v. Lawton*, 136 S.E.2d 708, 710 (S.C. 1964). "[T]here is no fixed rule or standard whereby damages for them can be measured[,]" and the amount of damages awarded for pain and suffering is left to the sound discretion of the Court. *Id.*

69.    There is no doubt that Plaintiff endured a great deal of pain and discomfort during the delayed period that the wood fragment remained in his jaw. He testified regarding the pain and discomfort, including when the wound became infected, and he made requests for stronger medication to address his pain and discomfort.  After careful consideration of the record in this case, the Court concludes that a damage award of $60,000.00 will reasonably and fairly

---

[5] In his proposed Findings of Fact and Conclusions of Law, Plaintiff has requested an award of attorneys' fees and costs in this case. However, any such request should be made in a post-judgment motion or application, not as part of a proposed order. Any party seeking a recovery of fees and other expenses is directed to file any such request within the time frames and with the requisite supporting information, as set forth in the Equal Access to Justice Act and the applicable Federal Rules of Civil Procedure. *See* 28 U.S.C. § 2412(d)(1)(B); Fed. R. Civ. P. 54(d); *Harmon v. United States*, No. 5:00-1072, 2005 WL 713326, *2 (S.D.W. Va. 2005) (finding, upon consideration of a post-judgment motion for fees and costs, that while the FTCA provides a limit to the amount of fees an attorney may charge, the FTCA contains no express and specific authorization for awarding attorney's fees to a prevailing party in addition to the amount of the judgment).

compensate Mr. Frye for the pain and suffering he experienced as a result of the breach of the standard of care in this case.

70.     Similarly, there is no fixed standard by which damages for mental anguish can be measured. *See Mims v. Florence Co. Ambulance Serv. Comm'n*, 370 S.E.2d 96, 99 (S.C. Ct. App. 1988) (amount of damages fact finder may award for physical pain and suffering and for mental pain and suffering is incapable of exact measurement and is therefore left for determination by the fact finder).

71.     Mr. Frye testified to being anxious and depressed during the time period of the delay and continuing. Based on the evidence, the Court awards Mr. Frye $30,000 for past and future mental anguish.

## CONCLUSION

Based on the foregoing, the Court **FINDS AND CONCLUDES** that Defendant is responsible and liable for the above stated damages. The Court hereby directs the Clerk of Court to enter judgment in favor of Plaintiff against Defendant in the amount of $90,000.00.

**IT IS SO ORDERED**.

Honorable Molly H. Cherry
United States Magistrate Judge

August 25, 2023
Charleston, South Carolina